[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11326
Non-Argument Calendar
_____

D.C. Docket No. 2:14-cv-00014-MHH

OIL EQUIPMENT COMPANY INC.,

Plaintiff-Appellant,

versus

MODERN WELDING COMPANY INC., et al.,

Defendants,

MODERN WELDING COMPANY OF GEORGIA INC,

Defendant-Appellee.
_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(September 29, 2016)

Before JORDAN, ROSENBAUM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

This is a products-liability case about an allegedly defective underground storage tank that began to leak. Plaintiff-Appellant Oil Equipment Company Inc. ("OEC") purchased the tank from the manufacturer, Defendant-Appellee Modern Welding Company of Georgia, Inc. ("Modern Welding"),[1] and later demanded a replacement under a limited warranty when testing revealed a breach in the tank. Upon investigation, Modern Welding determined that the warranty did not apply because it appeared that the tank's problems were caused by OEC's improper installation of the tank. More precisely, Modern Welding believed that the cause was the bedding material on which the tank sat. After OEC sent a demand letter raising the possibility of litigation, Modern Welding responded by asking OEC to notify it of when OEC planned to dig up and replace the tank so that Modern Welding could witness the exhumation and inspect the tank.

OEC, however, decided to remove and replace the tank without notifying Modern Welding. By replacing the tank, OEC destroyed any evidence that Modern Welding could have obtained from the bedding, although OEC took steps during the removal process to gather evidence showing that the tank was properly installed. Then, after removing the tank, OEC took no action to preserve it, and instead left the tank exposed to the elements for over a year before filing suit in

---

[1] The claims against the two other original defendants, Modern Welding Company, Inc., and Modern Welding Company of Florida, Inc., were dismissed with prejudice by the district court on February 22, 2016.

2

state court.  Finally, while litigation was ongoing, OEC had destructive testing performed on the tank without notifying Modern Welding.

At summary judgment, the district court found that OEC destroyed critical evidence in bad faith.  Using its inherent powers, the court dismissed the lawsuit with prejudice as a sanction for OEC's spoliation of evidence, finding that no lesser sanction would suffice.  OEC appeals, arguing that there was no spoliation and no bad faith, and that, even if some sanction was appropriate, dismissal was more severe than warranted under the circumstances.  After careful review, we conclude, based on this Court's decision in *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939 (11th Cir. 2005), that the district court acted within its discretion by dismissing the case with prejudice.

## I. BACKGROUND

### A.    *Factual Background*

OEC is in the business of selling, servicing, and installing petroleum equipment.  In April 2010, OEC purchased a 12,000-gallon "Glasteel II" underground storage tank ("Glasteel II tank" or the "tank") from Modern Welding, the manufacturer, for $12,460.00.  OEC planned to install the tank for another company at a gas station in Montgomery, Alabama.  The tank would later hold both gasoline and diesel fuel.

The Glasteel II tank has three main components.  First, an inner steel tank holds the product (the "steel tank" or "primary tank").  The steel tank in this case was divided by a steel bulkhead wall into separate compartments of 4,000 gallons and 8,000 gallons.  Second, an outer shell made of fiberglass and polyester resin encases the tank (the "fiberglass shell" or "secondary tank").  Third, an empty space sits between the steel tank and the fiberglass shell (the "interstitial space"). A monitoring tube that runs through the steel tank allows the interstitial space to be checked for fluids, which, if present, may indicate a leak in either the steel tank or the fiberglass shell, depending on the type of fluid present.

Modern Welding delivered the tank to the site in late May 2010.  Upon delivery, the interstitial space was checked and found to be able to maintain a vacuum, indicating no leakage.  OEC's Superintendent visually inspected the tank before installation and saw no damage to its fiberglass shell.  OEC installed the tank on June 9, 2010.

In general terms, a tank is installed by placing it on top of bedding material (here, sand) in an excavated pit, filling in the pit around the tank with backfill material (again, sand, in this case), and then paving over the area with concrete, so that, for example, cars can drive over the area.  While the term "backfill" in the record can refer to the material both underneath and surrounding the tank, we use

4

the terms "bedding" or "bedding material," when possible, to refer specifically to the material directly underneath and supporting the tank.

OEC's Superintendent supervised the installation process and completed an installation checklist provided by Modern Welding.  The Superintendent testified that OEC fully complied with the installation instructions.  However, the installation checklist reflects no response to the following question:  "Has special care been used to ensure backfill compaction along the tank's bottom quadrant?"  The installation instructions explain in slightly more detail that "[s]pecial care should be used to ensure that the backfill is properly installed to evenly support the bottom quadrant of the tank."

In August 2012, OEC reported finding diesel fuel in the interstitial space.  Modern Welding came out to inspect the tank and could not get the interstitial space to hold a vacuum, indicating a leak.[2]  On August 21, 2012, a third-party company, National Tank Monitor, inspected the tank at OEC's request and found a leak in the primary tank, according to OEC President Geoffrey Smith.  Modern Welding also had the tank inspected.  In early September 2012, C&S Petroleum removed the fuel in the tank, cut an access opening, and entered the tank.  Inside, C&S Petroleum found what it described as a two-foot by seven-foot "flat spot" on

---

[2] There were also two prior instances, in March 2011 and March 2012, when Modern Welding came out to check on a report of fluid in the interstitial space.  On both occasions, Modern Welding was able to re-establish a vacuum.

5

the bottom of the 8,000-gallon compartment near the bulkhead wall. Later that month, Superior Services inspected the tank and, while it could detect no breach in the primary tank, it detected a breach in the fiberglass shell.

OEC requested a replacement tank from Modern Welding under the limited warranty covering the tank, which warranted that the tank would be "free from defects in materials and workmanship." Under the warranty, Modern Welding had discretion to repair or replace the tank or to refund the original purchase price. Critically, the warranty applied only if the tank was "installed in accordance with the installation instructions . . . as evidenced by the return of the completed installation checklist."

On October 2, 2012, after informal attempts at resolution failed, OEC's counsel sent a letter to Modern Welding demanding a replacement tank or a refund under the warranty because there was "clear evidence of a defect in the manufacture and construction" of the tank. The letter stated that OEC planned to "cover the costs of rectifying this situation," including the costs of obtaining and installing a new tank, and that, if Modern Welding did not comply with OEC's demand, "Oil Equipment will seek recovery of all of its costs from Modern Welding." *Id.* Clearly, at this point, OEC knew that litigation was a possibility.

In a response letter sent on October 4, Modern Welding attributed the problems with the tank to improper installation, which "would not be covered by

the warranty." Modern Welding was "of the opinion that the backfill was not properly installed under the bottom quadrant of this tank, and that without this proper support the tank shell became overstressed." *Id.* The letter noted both the presence of a flat spot on the bottom of the tank, which "illustrate[d] overstressing of the shell," and the omission of a response by OEC on the installation checklist to the question, "Has special care been used to ensure backfill compaction along the tank's bottom quadrant?" Modern Welding concluded by stating that it was willing to consider any evidence of defective material or workmanship as long as it received "*at least four days' prior written notice of the date on which the tank is to be exhumed, and as long as we are permitted to have a representative present to witness the exhumation and to examine the tank thereafter.*"

As the district court later found when dismissing the case, "It was important for Modern Welding to witness the tank's removal because the exhumation of a potentially faulty tank offers the best chance to identify defects, and the installation of a new tank necessarily erases signs of improper installation that may have existed in the old bedding." Robert Shepard, OEC's expert, explained that the removal process was "definitely . . . the best time to see what the issue was" regarding whether the tank was properly installed, and that, once the tank is removed and another tank is put in its place, the opportunity to inspect the bedding where the original tank was situated is lost forever.

Despite Modern Welding's explicit request for notice of the exhumation, OEC chose to proceed without telling Modern Welding. The exhumation took place on October 16, 2012, having been scheduled more than a week beforehand. OEC President Smith stated that he decided to proceed without Modern Welding because OEC was under pressure from the gas-station owner to get a tank operational again, and he felt that he did not have time to wait for Modern Welding to determine if it would provide a replacement tank after witnessing the exhumation. Modern Welding had told Smith a replacement tank could take up to two weeks.

Though OEC excluded Modern Welding from the exhumation, OEC took steps to collect its own evidence about whether the tank had been properly installed. Smith asked Shepard, who had been hired by the gas station to do environmental soil analysis for the exhumation, to observe the tank's removal and verify that the tank had been properly installed and that OEC had placed proper backfill. At Smith's request, Shepard did a "grain size analysis" of the backfill material, checked the thickness of the backfill at the level where the tank sat, visually inspected the bedding, and took photographs throughout the removal process. Notably, though, Shepard did not conduct any testing to determine the compaction level of the bedding. Nor did he take any other measurements of the area "directly under the tank because [he] did not want to mess with the bed."

8

Smith also was present for the removal and discussed the possibility of litigation with Shepard. Smith did not mention the alleged "flat spot" in the tank. After the exhumation, Shepard prepared a report concluding that the tank had been installed in substantial compliance with the installation instructions.

Once the tank was removed, Shepard noticed an eighteen-inch crack in the fiberglass shell on the underside of the tank running along the line of the bulkhead wall. The crack was on the bottom of the tank where it rested in the bed. Based on the location of the crack—along the bulkhead—OEC believed that it was caused by defective welds in the bulkhead or some other defect in that area.

After the exhumation, OEC transported the tank to an OEC employee's land, where it was stored in an open field. OEC took no steps to preserve the integrity of the tank, and OEC did not notify Modern Welding of the tank's removal or its location. The tank was left exposed to the elements for over a year before OEC filed this lawsuit in state court in November 2013. Smith knew that exposure to the sun "wouldn't be good" for the tank and would cause the fiberglass shell to "dry out and degrade itself over a period of time." And so it did. By the time Modern Welding's expert examined the tank in May 2014, the tank had been in the field for almost nineteen months, and the original crack, according to the expert's preliminary report, had "grossly changed since the Tank was first removed from

9

the ground."[3]  The expert opined that "due to improper storage and preservation, weather exposure, and handling, there is no way anyone can now determine what might have caused the crack in the outer fiberglass shell of the tank." *Id.* at 9.

Modern Welding removed the lawsuit from state court to the United States District Court for the Northern District of Alabama in early January 2014.  On January 20, 2015, less than two weeks before the close of discovery and after the expert-disclosure deadline, OEC disclosed for the first time that it had the bottom portion of the tank cut out and tested to determine if the bulkhead welds were defective.  The testing occurred on December 15, 2014.

## B.     *Procedural History*

In the operative amended complaint, OEC alleged that the tank was defectively designed or manufactured and that Modern Welding had breached both express and implied warranties.  Modern Welding moved for summary judgment on grounds that OEC had destroyed critical evidence and could not support its claims.  OEC responded in opposition to summary judgment.

---

[3] In its reply brief, OEC contends that the district court should not have considered the preliminary report of Modern Welding's expert, Dean Harris, because OEC had not been permitted to depose him and had moved to strike his report before the district court.  But OEC did not raise this issue in its initial brief on appeal, instead merely referencing its motion to strike in passing, and we generally do not consider arguments raised for the first time in a reply brief. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–82 (11th Cir. 2014) (explaining that a party abandons an issue by making only passing references to it in an initial brief, and that we do not consider arguments raised for the first time in a reply brief).

The district court dismissed the case with prejudice, finding that OEC destroyed evidence vital to the action on three separate occasions. First, OEC exhumed the tank, prepared a new bedding and backfill, and installed a replacement tank without notifying Modern Welding. Second, OEC failed to preserve the tank once it had been removed, instead leaving it exposed to the elements. Third, OEC had destructive testing performed on the tank, again without notifying Modern Welding, while the lawsuit was pending.

These actions, according to the district court, resulted in severe prejudice to Modern Welding because the spoliation of critical evidence, the practical importance of which "cannot be overstated," deprived Modern Welding of the opportunity to put on a complete defense. Specifically, the court found, Modern Welding could have prevailed in defending against OEC's claims had it been able to show that the tank was improperly installed or that the welds and fiberglass shell were not defective. But "because the tank's bedding, backfill, fiberglass shell, and bulkhead welds cannot be restored, and the information these pieces of evidence might have yielded is not otherwise available," the prejudice to Modern Welding could not have been cured.

The district court also determined that OEC acted in bad faith. OEC, the court reasoned, chose to exclude Modern Welding from the exhumation despite an unambiguous request for notice. Then, after the exhumation, OEC could have, but

did not, grant Modern Welding's request to examine the tank, and it failed to take any precautions to preserve the tank. Finally, "in the midst of litigation that already had triggered allegations of spoliation," OEC undertook destructive testing on the bulkhead welds, again without notice. The court concluded, "Any of these instances of spoliation might be sufficient to demonstrate bad faith. Taken together, they demand dismissal." OEC now appeals.

## II.  DISCUSSION

### A.    *Standard of Review*

We review a district court's decision regarding spoliation sanctions, including a dismissal with prejudice, for an abuse of discretion. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943 (11th Cir. 2005); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 55, 111 S. Ct. 2123, 2138 (1991) (sanctions under inherent powers reviewed for abuse of discretion). Abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach; therefore, when applying this standard of review, we must affirm unless we find the judge has made a clear error in judgment or has misapplied the law. *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1238 (11th Cir. 2006).

### B.    *Governing Law*

#### 1.    Spoliation Sanctions Generally

12

A district court has "broad discretion" to impose sanctions as part of its "inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of cases." *Flury*, 427 F.3d at 944. Sanctions for spoliation of evidence are intended "to prevent unfair prejudice to litigants and to insure the integrity of the discovery process." *Id.* "Spoliation" refers to "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).

To determine whether and what sanctions are warranted for spoliation of evidence, courts should primarily consider the extent of prejudice caused by the spoliation (based on the importance of the evidence to the case), whether that prejudice can be cured, and the culpability of the spoliator. For example, in *Flury* we identified the following five factors as relevant to the analysis: (1) the prejudice to the defendant; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the plaintiff acted in bad faith; and (5) "the potential for abuse if expert testimony about the evidence was not excluded." *Flury*, 427 F.3d at 945. Similarly, Alabama state law frames the relevant factors as follows: "(1) the importance of the evidence destroyed; (2) the culpability of the offending party; (3) fundamental fairness; (4) alternative sources of the information obtainable from the evidence destroyed; and (5) the possible

13

effectiveness of other sanctions less severe than dismissal." *Story v. RAJ Props., Inc.*, 909 So. 2d 797, 802–03 (Ala. 2005).[4]

Sanctions for spoliation of evidence include "(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator." *Flury*, 427 F.3d at 945. Because dismissal is the most severe sanction available, it "should only be exercised where there is a showing of bad faith and where lesser sanctions will not suffice." *Id.* at 944. We have found that dismissal may be warranted where the "spoliation of critical evidence . . . deprive[s] the opposing party of an opportunity to put on a complete defense." *Id.* at 947.

With regard to the spoliator's culpability, "this circuit does not require a showing of malice in order to find bad faith," but we do require something more than "mere negligence." *Mann*, 588 F.3d at 1310; *see Flury*, 427 F.3d at 946; *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). Generally, bad faith may be found where the plaintiff's actions are responsible for the spoliation of evidence and "the plaintiff fully appreciated the significance of the evidence to the anticipated litigation." *Story*, 909 So. 2d at 804; *see Flury*, 427 F.3d at 945

---

[4] We held in *Flury* that "federal law governs the imposition of sanctions for failure to preserve evidence in a diversity suit." *Flury*, 427 F.3d at 944. Nonetheless, we looked to the law of the forum state, Georgia, because it provided "some guidance," was relied upon by the parties and the district court, and was "wholly consistent with federal spoliation principles." *Id.* In this case, for similar reasons, we look to Alabama state law on spoliation sanctions, at least to the extent it is consistent with *Flury*.

(finding the plaintiff at fault because the "plaintiff should have known that the vehicle, which was the very subject of his lawsuit, needed to be preserved and examined as evidence central to his case").

### 2.    Flury v. Daimler Chrysler Corp.

Because this Court's decision in *Flury* addressed dismissal as a spoliation sanction in circumstances similar to those in this case and further, because *Flury* is relevant to many of the issues before us, we examine the decision in some detail. In *Flury*, the plaintiff sued an automobile manufacturer, claiming that he was injured by a defect in his truck's airbag system, which failed to deploy when he fell asleep at the wheel and crashed into a tree. *Flury*, 427 F.3d at 940–41. The plaintiff asserted that the airbags were defective because, according to the plaintiff's expert, the airbags should have deployed at the speed at which he hit the tree. *Id.* at 941. After the accident, the truck was transported first to an auto-body shop and then to the residence of the plaintiff's parents. Eventually, the plaintiff's insurer sold the truck for salvage. Despite a request by the manufacturer to inspect the truck, the plaintiff did not tell the manufacturer the location of the truck or notify the manufacturer that the vehicle would be sold for salvage. *Id.*

The district court allowed the case to proceed to trial despite the manufacturer's request for summary judgment on the basis of spoliation. *Id.* at 942. At trial, the court instructed the jury "to apply a rebuttable presumption that

15

the evidence not preserved, in this case the vehicle, was unfavorable to the party responsible for spoliation," leaving for the jury's determination the responsible party. *Id.* at 942–43. The jury returned a verdict in favor of the plaintiff.

On appeal, we held that the district court abused its discretion by not dismissing the case based on the plaintiff's spoliation of critical evidence—the truck. *Id.* at 943. We explained that the manufacturer suffered severe prejudice because it was deprived of the opportunity to gather evidence in its defense. *See id.* at 946. Specifically, the manufacturer did not have the opportunity to examine the vehicle's crush pattern ("often the best evidence of a vehicle's impact speed"), its airbag control module ("capable of providing reliable evidence of airbag malfunction"), or its present condition (to determine whether the truck "remained in its 'condition when sold' at the time of the accident, as required by Georgia law"). *Id.* We concluded that "direct examination of the vehicle's condition was critically important to this case," that the spoliation of the truck "forced experts to use much less reliable means of examining the product's condition," and that the court's jury instruction was inadequate to cure the prejudice to the defendant. *Id.*

We also found the requisite "bad faith" because the plaintiff knew both the location of the vehicle and the defendant's desire to inspect it, but the plaintiff "ignored defendant's request and allowed the vehicle to be sold for salvage without notification to defendant of its planned removal." *Id.* at 944–45. And, in any

16

event, we reasoned, "plaintiff should have known that the vehicle, which was the very subject of his lawsuit, needed to be preserved and examined as evidence central to his case." *Id.* at 946. While the district court had suggested that the defendant was partially at fault for failing to inspect the truck, we concluded that "culpability rested solely upon the plaintiff" because the plaintiff was "the only party in a position to preserve the vehicle and failed to do so." *Id.*

Finally, we concluded that the destruction of the truck left potential for abuse in the case. *Id.* The plaintiff's expert had testified regarding the vehicle's condition based on post-accident photographs and an accident report, and this evidence had "some value," but the plaintiff's spoliation prevented the defendant "from obtaining much more reliable evidence tending to prove or disprove the validity" of the expert's statements. *Id.*

Overall, we held that the plaintiff's "spoliation of critical evidence . . . deprived the opposing party of an opportunity to put on a complete defense." *Id.* at 947. The manufacturer's request to examine the vehicle was ignored, and, as a result, "defendant was unable to examine the vehicle's condition." *Id.* Because the evidence was crucial and the prejudice incurable, we held that dismissal was the only appropriate sanction. *Id.*

## C.    *Application*

Here, the district court did not abuse its discretion by dismissing the case with prejudice as a sanction for OEC's spoliation of evidence. With knowledge that the evidence was critical to a potential lawsuit and to Modern Welding's potential defenses, OEC destroyed or allowed the destruction of the bedding and the tank without providing Modern Welding, as it had requested, notice and an opportunity to gather evidence in its defense. In dismissing the case with prejudice, the court correctly applied the law and reasonably concluded that the most severe sanction was warranted. *See Amlong & Amlong, P.A.*, 500 F.3d at 1238. After reviewing the relevant *Flury* factors, we agree with the district court's assessment that, as in *Flury*, "Plaintiff's spoliation of critical evidence in this case deprived the opposing party of an opportunity to put on a complete defense." *See Flury*, 427 F.3d at 947.

### 1.    OEC's Spoliation of Evidence Resulted in Severe Prejudice

The ultimate issue in controversy in this case was what caused the tank to leak. OEC believed that the breach was due to a manufacturing or design defect, such as defective welds, whereas Modern Welding attributed the breach to OEC's improper installation. Significantly, Modern Welding's theory, in turn, rested on its belief that "the backfill was not properly installed under the bottom quadrant of this tank, and that without this proper support the tank shell became overstressed." Modern Welding cited two reasons in particular for suspecting improper

18

installation as the cause:   (1) the installation checklist from OEC omitted a response to the question, "Has special care been used to ensure backfill compacting along the tank's bottom quadrant?"; and (2) inspectors hired by Modern Welding observed a two-foot by seven-foot "flat spot" inside the tank, which, according to Modern Welding and its expert, was consistent with improper bedding.  Modern Welding asked OEC for advance notice so that it could witness the exhumation and examine the tank.

Despite OEC's assertions to the contrary, we think it is obvious based on these facts that the bedding was critically important to Modern Welding's contention that the tank was improperly installed.[5]  Even OEC's expert testified that the removal process was "definitely . . . the best time to see what the issue was" regarding whether the tank was properly installed.  And, as the district court found, if Modern Welding had been notified of the exhumation, it could have conducted tests, such as soil compaction tests, during the exhumation which "might have revealed a failure to compact the backfill along the tank's bottom

---

[5] OEC's briefing is replete with assertions suggesting that the "bedding was not an issue" for Modern Welding because Modern Welding never asked to preserve the bedding for inspection and was instead focused on the tank only.  True, Modern Welding did not explicitly state its intention to test the bedding in the October 4 letter, but the bedding quite clearly was the focus of Modern Welding's October 4 letter, and it was critical to the question of whether the tank had been properly installed, as even OEC recognized.  Indeed, OEC President Smith asked Shepard to witness the exhumation, test the backfill, take photographs, and prepare a report on whether the tank had been properly installed.  It makes little sense to say that Modern Welding was focused on only the tank when Modern Welding explicitly attributed the tank's failure to improperly installed bedding.

19

quadrant, evidence that would be consistent with OEC's omission on the tank's installation checklist." And Modern Welding also might have determined that the tank developed a flat spot in the steel compartment and a crack in the fiberglass shell because of improper installation. Yet OEC ignored Modern Welding's explicit request for notice of the exhumation and exhumed and replaced the tank in Modern Welding's absence. The replacement of the tank prejudiced Modern Welding because it prevented Modern Welding from directly examining the bedding and verifying its theory that the tank had been improperly installed. *See Flury*, 427 F.3d at 946 (finding severe prejudice because "direct examination of the vehicle's condition was critically important to this case").

Then, after the exhumation, Modern Welding was prejudiced by OEC's failure to preserve the integrity of the tank. OEC let the tank sit exposed to the elements in an open field for over a year before filing suit. By the time Modern Welding's expert examined the tank in May 2014, the original eighteen-inch crack in the fiberglass shell, observed by Shepard in October 2012, had "grossly changed" due to sun exposure. Modern Welding's expert opined that "due to improper storage and preservation, weather exposure, and handling," it was not possible to "now determine what might have caused the crack in the outer fiberglass shell of the tank."

20

And while OEC responds that Modern Welding was not prejudiced because the existence of the crack is undisputed, that was never at issue. What matters is that the deterioration of the tank prevented Modern Welding from developing evidence for the purpose of showing that the crack in the fiberglass shell was not caused by defective materials or workmanship. The district court did not abuse its discretion in finding prejudice on this point.

Finally, the district court determined that Modern Welding was prejudiced by OEC's destructive testing of the bulkhead welds because, "[i]f Modern Welding had participated in the testing of the tank's bulkhead welds, Modern Welding might have developed expert testimony regarding the welds' condition and the extent to which the condition could have caused a breach in the tank." OEC downplays the significance of this testing in its reply brief, asserting that the evidence it obtained was unnecessary and likely could not have been introduced anyway due to discovery deadlines. We likewise do not focus on this act of spoliation with regard to the prejudice inquiry, but we note that OEC does not directly challenge the court's finding on this point.

Overall, we conclude that the bedding and the tank are as central to this case as the truck was in *Flury*. By first excluding Modern Welding from the exhumation, the best time to assess any installation issues, and then failing to preserve the tank or to allow Modern Welding to examine it shortly after

21

exhumation, OEC prevented Modern Welding from gathering critical evidence relevant to its theory that the tank was not defective and that improper installation was the culprit.

2.      The Prejudice to Modern Welding Cannot be Cured

The district court determined that the prejudice to Modern Welding was incurable. Specifically, the court found, "the tank's bedding, backfill, fiberglass shell, and bulkhead welds cannot be restored, and the information these pieces of evidence might have yielded is not otherwise available." We agree.

We are not convinced by OEC's arguments that any prejudice can be cured by alternative sources of evidence available or that sanctions less severe than dismissal would be effective. First, Modern Welding's initial inspections (through third-party testing) of the inside of the tank plainly are no substitute for examining the bedding and backfill outside of the tank. As indicated by OEC's expert, the best time to determine whether the tank was properly installed was during exhumation. Nor can we say that these initial inspections, when the parties were still attempting to figure out if, and, if so, where, the tank was leaking, could adequately substitute for a later inspection of the tank after the crack in the fiberglass was discovered. Extrapolating from these initial inspections would be far less reliable than examining the bedding or the tank itself once the crack was discovered. *Cf. Flury*, 427 F.3d at 946 (finding that prejudice was not cured where

22

the spoliation of the truck "forced experts to use much less reliable means of examining the product's condition").

Second, photographs of the bedding, however "extensive," likewise are no adequate substitute for direct examination of the bedding. OEC has offered no plausible explanation for how one could determine, for example, the soil compaction level of the bedding through the photographs. Without expressing any opinion on whether photographs could constitute an adequate substitute in another case based on different facts, the photographs of the bedding in this case, like the post-accident photographs of the truck in *Flury*, do not cure the prejudice caused by Modern Welding's exclusion from the exhumation. *See id.* at 941, 946 (implicitly concluding that the post-accident photographs of the truck, which were relied upon by the plaintiff's expert, did not cure the prejudice caused by the manufacturer's inability to directly examine the truck).

Third, we reject OEC's contention that no prejudice occurred, or that any prejudice can be cured, because "[t]here are at least three witnesses who can testify that the bedding was prepared to the appropriate standard": Smith, Shepard, and the OEC Superintendent who supervised the installation of the tank. If anything, such one-sided testimony heightens the potential for prejudice because Modern Welding would be able to rebut it with its own evidence. Certainly this testimony has value, and we do not mean to imply that any of these witnesses would testify as

23

to anything other than the truth as they saw it, but, as in *Flury*, "we cannot ignore the fact that defendant was precluded from obtaining much more reliable evidence tending to prove or disprove" the validity of testimony that the tank was properly installed. *Id.* at 946. Essentially, OEC gathered evidence favorable to its position while precluding Modern Welding from doing the same. *See Story*, 909 So. 2d at 805.

Furthermore, even assuming that OEC's expert, Shepard, who conducted some testing during the exhumation process, could be considered a neutral and objective expert on installation, his opinion still is not an adequate, alternative source of evidence that could remedy the prejudice to Modern Welding. Notably, Smith did not inform Shepard of the flat spot observed by Modern Welding's inspectors, so Shepard would have had little reason to focus on whether the bedding might have caused the flat spot. Shepard also did not do any testing on or measurements of the bedding that could have verified or dispelled Modern Welding's belief that OEC failed to ensure backfill compaction along the tank's bottom quadrant. Overall, we are unconvinced that the availability of alternative sources of evidence could cure the severe prejudice to Modern Welding.

Nor did the district court abuse its discretion in determining that, assuming OEC acted in bad faith, which we address below, no lesser sanction would be effective to cure the severe prejudice in this case. The tank and the bedding on

24

which it sat were the very subjects of this lawsuit. OEC's spoliation of this evidence struck at the heart of the matter and prevented Modern Welding from putting on a complete defense. *See Flury*, 427 F.3d at 946 n.14 & 947. Therefore, OEC has not shown that the district court committed a clear error in judgment by concluding that the sanction of dismissal was warranted.

3.    OEC Acted in Bad Faith

Finally, the record amply supports the district court's determination that OEC acted in bad faith. As the court found, OEC chose to exclude Modern Welding from the exhumation despite Modern Welding's request for notice and an opportunity to be present. In doing so, OEC forever destroyed any evidence Modern Welding may have obtained through direct examination of the bedding.

When it made that decision, OEC knew that the evidence was crucial to Modern Welding's claim that the tank was improperly installed. OEC, for instance, gathered its own evidence on the matter in response to Modern Welding's letter identifying the bedding as an issue.

OEC also knew that litigation was a possibility at the time of the exhumation: OEC had sent a demand letter through counsel raising the possibility of litigation about two weeks earlier; and Smith discussed the possibility of litigation with Shepard on the date of the exhumation. Then, after the exhumation, OEC had a responsibility to preserve the tank for potential use as evidence, but

OEC failed to "grant[] Modern Welding's request to examine the tank or take[] precautions to preserve the tank" and "instead OEC let the tank degrade." OEC later had destructive testing done on the tank without notifying Modern Welding.

Based on these facts, the district court reasonably concluded that OEC acted in bad faith. These facts make it apparent that OEC "fully appreciated the significance of the [spoliated] evidence to the anticipated litigation." *See Story*, 909 So. 2d at 804.

OEC claims that it did not act in bad faith because it expected the bedding to support its position, so it did not destroy evidence that it knew was favorable to Modern Welding. In support of this argument, OEC relies on the Alabama Supreme Court's statement in *Story* that, in a "classic case" of spoliation under Alabama state law, the plaintiff "purposefully and wrongfully destroyed evidence he knew was supportive of the interest of his opponent." *Story*, 909 So. 2d at 804. OEC reasons that its conduct does not satisfy that standard. But this standard strikes us as equivalent to a showing of "malice," which, while clearly sufficient, is not necessary to support a finding of bad faith in this Circuit.[6] *See Mann*, 588 F.3d at 1310.

---

[6] In any case, the fact that OEC destroyed evidence to which it knew Modern Welding wanted access could support an inference that OEC suspected the bedding might not be favorable to its case. *See Story*, 909 So. 2d at 805 ("[T]he trial court could have inferred that Story knew that those inspections would not be beneficial to his case or he would not have . . . evaded the inspections.").

In *Flury*, for example, the analysis of bad faith did address whether the plaintiff knew that evidence from the truck would be favorable to the defendant. Rather, we "weigh[ed] the degree of the spoliator's culpability against the prejudice to the opposing party." *Flury*, 427 F.3d at 946. And we found that culpability rested squarely with the plaintiff because the plaintiff "was the only party in a position to preserve the vehicle and failed to do so." *Id.* The plaintiff knew the location of the vehicle, knew that the defendant wanted to inspect it, but let the vehicle be sold for salvage, which caused extreme prejudice to the defendant. *See id.* at 945–46.

The same reasoning applies in this case. The duty to preserve evidence critical to this case rested with OEC. But OEC excluded Modern Welding from the exhumation and then failed to preserve the tank after exhumation. OEC attempts to blame Modern Welding for failing to inspect the tank until after OEC filed suit, but its efforts are misguided. Like the plaintiff in *Flury*, OEC failed to respond to the opposing party's request to inspect the allegedly defective product, OEC had control over the product and did not inform the opposing party of its location, and then OEC failed to preserve the product. *See id.* at 945–46. It makes little difference that OEC kept the tank rather than salvaging it like the insurer in *Flury* did with the car at issue in that case, since OEC allowed the tank to deteriorate in an open field. And OEC's contention that it should be excused since

27

it had no reasonable means for storing the tank only serves to highlight its initial choice to exclude Modern Welding from the exhumation. Permitting an inspection at that earlier opportunity could have avoided the need for long-term storage of the tank, and, quite possibly, this entire litigation. Culpability, therefore, rested with OEC, and the prejudice to Modern Welding was great. *See id.* at 946.

Finally, OEC claims that it did not violate any court orders by conducting destructive testing on the bulkhead welds, but that assertion in no way undermines the district court's finding that OEC again chose to gather evidence in a manner that denied Modern Welding the same opportunity.

In sum, the record amply supports the district court's finding of bad faith on the part of OEC resulting in severe prejudice to Modern Welding.

### III.  CONCLUSION

After a close examination of the facts of this case and the similar facts of *Flury*, we hold that the district court did not abuse its discretion by dismissing this product-liability case with prejudice as a sanction for OEC's bad-faith spoliation of evidence critical to the litigation. Accordingly, we affirm the judgment of the district court.

**AFFIRMED.**