[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

———————————————

No. 20-11141

———————————————

ALABAMA AIRCRAFT INDUSTRIES, INC.,
ALABAMA AIRCRAFT INDUSTRIES, INC. BIRMINGHAM,
PEMCO AIRCRAFT ENGINEERING SERVICES, INC.,

Plaintiffs-Appellant - Cross-Appellees,

*versus*

THE BOEING COMPANY,
BOEING AEROSPACE OPERATIONS, INC.,
BOEING AEROSPACE SUPPORT CENTER,

Defendants-Appellees - Cross-Appellants.

———————————————

Appeals from the United States District Court
for the Northern District of Alabama

D.C. Docket No. 2:11-cv-03577-RDP

———————————————

Before JILL PRYOR and LUCK, Circuit Judges.[1]

PER CURIAM:

Pemco[2] and Boeing[3] are aerospace companies that perform contract work for the United States Air Force. Like other companies in this highly competitive arena, Pemco and Boeing participate in the Air Force's procurement process. With this process, the Air Force solicits bids—offers from contractors to perform specified work at a given price—and awards contracts based on the bids it receives. All things being equal, the lower the price, the more attractive the bid.

This litigation arose from a lucrative opportunity to obtain a contract to maintain, repair, and upgrade the Air Force's fleet of KC-135 Stratotanker aircraft. Pemco and Boeing decided they would pursue the opportunity together and submit a joint bid. Lawyers for Pemco and Boeing drew up contracts outlining the

---

[1] Following oral argument, Judge Andrew L. Brasher recused himself from this appeal. It is appropriate for the remaining members of the panel to fulfill their responsibility to consider the appeal if they can reasonably do so. See Tillman v. R.J. Reynolds Tobacco, 253 F.3d 1302, 1304 n.* (11th Cir. 2001). This decision is rendered by a quorum of judges who sat for oral argument. See 28 U.S.C. § 46(d).

[2] "Pemco" refers to plaintiffs Alabama Aircraft Industries, Inc.; Alabama Aircraft Industries, Inc. – Birmingham; and Pemco Aircraft Engineering Services, Inc.

[3] "Boeing" refers to defendants The Boeing Company; Boeing Aerospace Operations, Inc.; and Boeing Aerospace Support Center.

respective rights and responsibilities of the two companies for what they referred to as their teaming arrangement.

The teaming arrangement eventually fell apart. After the Air Force reduced the number of KC-135s available for maintenance, repair, and upgrade work, Boeing informed Pemco that it was terminating their agreement. The two companies pursued the opportunity to perform the KC-135 work as competitors. Ultimately, Boeing submitted a bid only 1.28% lower than Pemco's, and it won the contract. Pemco went out of business and into bankruptcy.[4]

Pemco sued Boeing on several theories of liability, including a misappropriation-of-trade-secrets claim and two breach-of-contract claims. The district court dismissed Pemco's misappropriation-of-trade-secrets claim in a pretrial order. But Pemco's breach-of-contract claims went to trial, where a unanimous jury found for Pemco on both counts.

Pemco appeals the district court's dismissal of its misappropriation-of-trade-secrets claim. Boeing cross-appeals a discovery sanction—an adverse-inference jury instruction—the district court imposed upon it for spoliation of Electronically Stored Information ("ESI"). Boeing also cross-appeals based on a jury instruction regarding the implied promise of good faith and fair dealing. Boeing

---

[4] Pemco brought this lawsuit by and through Joseph Ryan, the trustee of Pemco's litigation trust established after bankruptcy proceedings.

4                    Opinion of the Court                    20-11141

maintains that the magnitude of each error independently warrants a new trial.

After careful review and with the benefit of oral argument, we reverse the district court's dismissal of Pemco's misappropriation-of-trade-secrets claim and remand for further proceedings on that claim. We find no reversible error in the district court's sanction against Boeing or in the implied-promise-of-good-faith-and-fair-dealing jury instruction. As a result, we decline to disturb the jury's verdict as to Pemco's breach-of-contract claims.

## I.     FACTUAL BACKGROUND[5]

The KC-135 is a 1950s-era tanker aircraft that refuels other aircraft mid-flight. The Air Force's fleet of KC-135s requires Programmed Depot Maintenance ("PDM")—maintenance, repair, and upgrades to keep the aircraft in service. This case is about the parties' respective efforts to win a contract for PDM services on the Air Force's KC-135s.[6]

---

[5] When reviewing an order granting a motion to dismiss, we accept as true all well-pled allegations in the operative complaint and construe them in the light most favorable to the plaintiff. See Hunt v. Aimco Props., L.P., 814 F.3d 1213, 1221 (11th Cir. 2016). We therefore recite the facts as Pemco has alleged them in its Second Amended Complaint, which was the operative complaint at the time of the district court's dismissal, except where we note otherwise.

[6] Because we write only for the parties, we assume their familiarity with the facts. We do not restate the facts except as necessary to explain our decision.

## A.    The Relationship Between Pemco and Boeing

Pemco had been the primary contractor performing PDM on the Air Force's fleet of KC-135s since 1969. Pemco's PDM services included "major upgrades" like "wing re-skin, . . . corrosion prevention control, auto pilot, and fuel savings advisory system modifications." Doc. 34 at 8.[7] Pemco's dominance in the KC-135 PDM area continued until the Air Force issued a Request for Proposals ("RFP")—a solicitation for bids—for KC-135 PDM in 1998.

The 1998 RFP posed a problem for Pemco: the RFP took the KC-135 PDM work Pemco had been performing for decades and bundled those services with tasks that Pemco was unable to perform—including work on the A-10, an altogether different aircraft. Pemco protested the RFP, contending that the bundling was illegal. The U.S. Government Accountability Office ("GAO") sustained Pemco's protest. Notwithstanding the GAO's finding in favor of Pemco, the Air Force permitted the bundled RFP to go forward as-is.[8]

---

[7] Citations to "Doc." refer to docket entries in the district court record.

[8] Pemco alleged that Boeing was involved in the RFP bundling. Pemco alleged that an Air Force procurement officer, Darleen Druyun, was receiving kickbacks from Boeing to act in Boeing's interest at the time. Druyun later pleaded guilty to corruption charges and admitted to giving Boeing preferential treatment on several government contracts because Boeing hired her family members as employees. Boeing officers were also sentenced to prison time due to

Boeing won the 1998 contract. Boeing's rush of victory was short-lived, however, because it found that it could not perform the KC-135 PDM to contract standards. Indeed, the Federal Aviation Administration ("FAA") fined Boeing $1.6 million because of Boeing's failure to ensure that its suppliers adhered to quality control practices, and the FAA proposed fining Boeing on two more occasions for similar reasons.

With the well-being of its KC-135 fleet at risk, the Air Force came up with a solution: it requested that Boeing and Pemco form a teaming arrangement. Under the teaming arrangement, Pemco would perform half of the touch labor—or hands-on labor—required for the KC-135 PDM as Boeing's subcontractor. Pemco and Boeing entered into the teaming arrangement the Air Force proposed.

After they began working together on the KC-135s, Pemco found that although its own PDM work was up to standard, Boeing continued to have difficulty in adequately performing its share. Ultimately, the Air Force decided not to exercise the final two option years under the 1998 contract. Instead, it awarded a temporary "bridge" contract to Boeing to continue the KC-135 PDM. Pemco

the Druyun scandal. Upon information and belief, Pemco alleged that Druyun was involved in bundling the requested services in this RFP.

continued to perform the KC-135 PDM work as Boeing's subcontractor under the bridge contract.

The Air Force decided to "recompete"—or seek new bids for—the KC-135 PDM work in fiscal year 2008. To help contractors prepare their bids, the Air Force released a draft RFP, which included estimates about what the new PDM contract would entail. The draft RFP included an important term known as the Best Estimated Quantity ("BEQ"). The BEQ was the number of KC-135s available for PDM work on an annual basis. The draft RFP included a BEQ of 44 KC-135s. With that information, contractors, including Pemco and Boeing, began preparing their bids.

## B.     The Contracts at Issue

With a history of performing KC-135 PDM together, Pemco and Boeing decided to submit a joint bid to win the 2008 recompete contract. They would pitch the same teaming arrangement that the Air Force had asked them to enter under the 1998 KC-135 PDM contract, in which Pemco would perform half of the KC-135 PDM as Boeing's subcontractor. Pemco and Boeing entered into a Memorandum of Agreement ("MOA"), a Work Share Agreement ("WSA"), and a Non-Disclosure Agreement ("NDA"), which spelled out the rules of their cooperative effort. We briefly discuss the contents of these documents.

The MOA set out the contours of the teaming arrangement. It indicated that Boeing, as prime contractor, and Pemco, as subcontractor, would enter an exclusive teaming arrangement and

jointly submit a bid for the PDM work. Pemco agreed to "provide . . . [proprietary] cost proposal information" to Boeing, which would help ensure that their joint bid was competitively priced. Doc. 568-18 at 4. Boeing promised that it "w[ould] award a subcontract to Pemco . . . for the work share to the extent that the government awards PDMs." *Id.* The MOA also contained a provision setting out the terms under which a party could terminate the teaming arrangement:

> After the release of any RFP or amendments thereto, if the contents thereof are so unfavorable to the [p]rime or [s]ubcontractor that participation in the [p]rogram is no longer practical or financially viable; in such case, the party seeking termination for this reason will provide written notice to the other party within 15 days of the receipt of the RFP (or amendment) giving notice of such.

*Id.* at 5.

Attached as "Exhibit A" to the MOA was the WSA, which described how Boeing and Pemco would divide their responsibilities. Boeing agreed Pemco would receive "50% of all KC-135 PDM inductions awarded." *Id.* at 10. The WSA also contemplated a situation in which the number of KC-135s available for PDM would be less than 44—the number provided in the draft RFP's BEQ. The WSA provided that "[i]n the event that the number of aircraft drops below a quantity that sustains two Sources of Repair (SOR), it is the intent of the parties that the touch labor would be performed

entirely at Pemco with the engineering and procurement remaining at [Boeing]." *Id.*

Pemco and Boeing also separately signed and dated an NDA, which was attached to the MOA.[9] The NDA's stated purpose was to "safeguard[] . . . [p]roprietary [i]nformation which is disclosed by and between the parties." *Id.* at 11. It provided that proprietary information could be used "solely" for the purpose of procuring the recompete contract in connection with the MOA, and that it could "not otherwise be used for the benefit of the recipient or others." *Id.* at 12. The NDA also included the following choice-of-law provision:

> 11. Applicable Law. The interpretation of this Agreement and the rights and liabilities of the parties to this Agreement shall be governed by the law of the state of Missouri, excluding its conflicts of laws principles.

*Id.* at 14.

## C.    The Breach

As contemplated by the MOA and NDA, Pemco supplied Boeing with proprietary information. That information included Pemco's "(a) pricing, (b) work flow and (c) processes and procedures." Doc. 34 at 26. Pemco also provided Boeing with its "estimated man hours for PDM services, and related touch labor

---

[9] Pemco's theory of the case, and the jury's verdict, was that Boeing breached both the MOA and NDA.

assumptions, depending on the number of planes that would be received." *Id.* With Pemco's proprietary information, Boeing was able to calculate Pemco's overall cost rate for KC-135 PDM work. With that information in hand, Boeing submitted the joint bid in October 2005.

Around the same time, however, Boeing began to consider "off ramps with Pemco."[10] Doc. 263-31 at 1. Boeing, aware that KC-135 PDM constituted more than 80% of Pemco's revenue, anticipated that it could force Pemco out of business if it won the recompete contract for itself. In the words of a Boeing division president, Boeing knew that the recompete contract was a "bet the farm" deal for Pemco. Doc. 263-2 at 3.

Unbeknownst to Pemco, Boeing had formed the "Truman Project" by May of 2006. The Truman Project was a secret committee within Boeing tasked with rewriting Pemco and Boeing's joint bid and converting it into a solo bid by Boeing. Boeing employees were "read into," meaning informed of and included in, the Truman Project on a need-to-know basis. Doc. 601 at 100:10–14, 102:19–23.

---

[10] Not all the facts in the remainder of the background section are taken from the allegations in Pemco's complaint. Some of the facts come from record evidence the district court considered in a pretrial order imposing sanctions on Boeing. Both parties make use of those facts in their briefs. For the sake of clarity and chronology, we have included some of those facts in the remainder of the background section.

At the end of May, the Air Force announced that the BEQ for the KC-135 contract would be lowered from 44 to 24 aircraft. A week later, Boeing sent Pemco a letter unilaterally terminating the teaming arrangement. In the letter, Boeing cited to language in the MOA that allowed for termination of the teaming arrangement if it was "no longer practical or financially viable" to move forward with a joint bid. Doc. 567-17 at 1. Pemco alleged that Boeing's stated reason for terminating the teaming arrangement was pretextual, as the parties had anticipated a reduction in the BEQ in the WSA and in other communications.

With their teaming agreement in tatters, Pemco and Boeing each bid separately on the recompete contract. Boeing submitted a bid of $1,165,138,187. Pemco submitted a bid of $1,180,186,789. The difference in these bids was just over $15,000,000, or 1.28%. Boeing won the contract. Pemco went out of business and ultimately filed for bankruptcy.

## II.    PROCEDURAL BACKGROUND

Following bankruptcy proceedings, Pemco filed suit against Boeing in Alabama state court, asserting various causes of action related to Boeing's breach of the teaming arrangement, including claims that Boeing breached the MOA and the NDA. Boeing removed the case to the United States District Court for the Northern District of Alabama.

### A.    Pemco's Misappropriation-of-Trade-Secrets Claim

Pemco amended its complaint to add a claim under the Missouri Uniform Trade Secrets Act ("MUTSA"), Mo. Rev. Stat. § 417.450, *et seq.* In support of this cause of action, Pemco alleged that Boeing misappropriated trade secrets—Pemco's proprietary information related to its pricing, costs, and work flow. Pemco asserted that the MUTSA rather than its Alabama counterpart, the Alabama Trade Secrets Act ("ATSA"), Ala. Code § 8-27-1, *et seq.*, governed its misappropriation-of-trade-secrets claim because, in Pemco's view, the NDA's choice-of-law provision mandated that "the rights and liabilities" of Pemco and Boeing were to be governed by Missouri law. Doc. 568-18 at 14.

The district court dismissed Pemco's MUTSA claim in a pretrial order. The court reasoned that Pemco's misappropriation-of-trade-secrets claim sounded in tort, which required application of *lex loci delicti* under Alabama law. That principle, the court reasoned, required it to apply the law of the state where Pemco sustained its injury, notwithstanding any choice-of-law provision to the contrary. Noting that Pemco sustained its financial injury in Alabama, the district court concluded that Alabama law applied.

The district court's choice-of-law analysis sounded the death knell for Pemco's misappropriation-of-trade-secrets claim: the MUTSA had a five-year statute of limitations, but the ATSA's statute of limitations was only two years. Once the district court applied Alabama's statute of limitations, there was no question that Pemco's misappropriation-of-trade-secrets claim was time-barred

by Alabama law. The district court dismissed Pemco's misappropriation-of-trade-secrets claim with prejudice.

## B.    Boeing's Spoliation of ESI

Following the dismissal of Pemco's misappropriation-of-trade-secrets claim, Pemco filed a motion for sanctions against Boeing. Pemco asserted that the Chief Financial Officer of Boeing's Support Systems Division, Steve Blake, spoliated ESI by permanently deleting Pemco-related emails and their attachments from his work computer.

The district court granted Pemco's motion in a pretrial order. In its 30-page memorandum opinion, the court found that Blake was the head of the Truman Project—the secret Boeing committee that sought to convert the Pemco-Boeing joint bid to a Boeing-only bid. By virtue of his seniority and position within Boeing, the court reasoned, Blake was exposed to Pemco's proprietary information and was familiar with pricing comparisons between the two companies.

The circumstances surrounding the deleted ESI, the district court found, indicated that Boeing acted with the intent to deprive Pemco of material evidence. After it unilaterally terminated the teaming arrangement, Boeing agreed to return "Pemco-originated proposal-related information" to Pemco's General Counsel. Doc. 263-28 at 1. Boeing circulated a Firewall Plan to its employees to collect Pemco-related information. The Firewall Plan required Boeing employees to copy the Pemco-related information on a disk

and deliver it to the Boeing Law Department for preservation. The district court found that Blake was aware of what the Firewall Plan required.

Claiming he was not savvy enough with technology to follow the Firewall Plan on his own, Blake summoned two Boeing employees, Patrick Holden and Kyle Smith, to his office. Notably, both Holden and Smith had already successfully complied with the Firewall Plan on their own. In fact, Holden was the Firewall Plan administrator—the Boeing employee who was "in charge" of the Firewall Plan. Doc. 588 at 52, 75. Holden and Smith were also members of Boeing's recompete team—the team responsible for submitting Boeing's solo bid on the recompete contract. When Holden and Smith accessed Blake's computer, they permanently deleted Pemco-related information from it. The deletion occurred through a two-step process. First, Holden and Smith moved the Pemco-related information to the recycle bin on Blake's computer. Second, the contents of the recycle bin were permanently deleted. And after the ESI was permanently deleted, Holden sent an email to Boeing's legal department saying that Blake had nothing to send them. Boeing argued that the deletion was an inadvertent mistake.

The district court was unpersuaded. It concluded that Boeing spoliated evidence with the intent to deprive Pemco of that evidence in litigation. The district court wrote that, were the case to proceed to trial, it would instruct the jury that it "*may* presume that the lost information contained in Blake's Pemco-related ESI was unfavorable to Boeing." Doc. 310 at 30 (emphasis in original).

## C.    Jury Instructions and Verdict

The case proceeded to trial. The district court revisited its pretrial sanction order against Boeing for Blake's spoliation of ESI. After it heard arguments from both sides regarding the appropriate adverse-inference jury instruction, it settled on the following language:

> Those who reasonably anticipate litigation are expected to preserve relevant information. In this case, you heard evidence that certain proprietary information on the computer of Steve Blake was deleted and not forwarded to the Boeing Law Department. As a result, this information was not available to Pemco in this litigation. It is for you to decide what happened and why it happened. I give you the following instructions to aid in your inquiry.
>
> If you find (1) that Boeing was anticipating litigation with Pemco (or reasonably should have been), and (2) that Boeing deleted this information with the intent to deprive Pemco of the use of the information in litigation relating to this dispute, you may infer that the lost information was unfavorable to Boeing. If you do not make these findings, you may not infer from the loss of the information that it was unfavorable to Boeing. Of course, if you do make the necessary findings and draw the permissible inference, it is for you to decide what force and effect to give it in light of all of

> the evidence in this case. Again, you are the judge of the facts as to what happened in this case, including what happened to these electronic documents, and why it happened.

Doc. 565 at 7–8.

At the urging of Pemco, the district court also instructed the jury on the implied promise of good faith and fair dealing. Boeing objected to the instruction, arguing that Pemco never pleaded a claim for breach of the implied promise. The district court settled on language that vaguely referenced an "implied promise" in the context of contract law:

> Pemco . . . has advanced two claims against Boeing. Both claims allege a breach of contract.
>
> In addition to the express terms of a contract, the law implies a promise between the parties that they will not do anything to interfere with a party's right to receive the contract's benefits. However, any such implied promise does not obligate either party to take any action that is contrary to the express terms of the contract, and there can be no breach of such an implied promise where the defendant acts in accordance with the express terms of the contract.
>
> I will now instruct you on the elements of Pemco's two breach of contract claims against Boeing.

*Id.* at 8.

The jury returned a unanimous verdict for Pemco on both of its breach-of-contract claims. On one count, the jury found that Boeing breached the MOA. On the other count, the jury found that Boeing breached the NDA. The district court entered a final judgment for Pemco. After the final judgment, Pemco filed a notice of appeal, indicating it was appealing the district court's pretrial dismissal of its misappropriation-of-trade-secrets claim.[11]

Boeing filed for a renewed judgment as a matter of law. There, Boeing challenged the district court's order imposing sanctions for spoliation of ESI and the resulting adverse-inference jury instruction. Boeing also challenged the implied-promise instruction. The district court denied Boeing's motion. Boeing filed a notice of cross-appeal, indicating that it was cross-appealing the district court's final judgment, the denial of its renewed motion for a judgment as a matter of law, "and/or all adverse rulings subsumed in the judgment or renewed motion, including . . . the March 9, 2017 order granting [Pemco's] motion for sanctions." Doc. 622 at 1.

On appeal, Pemco argues that the district court erred in dismissing its misappropriation-of-trade-secrets claim in the pretrial order. On cross-appeal, Boeing argues that the district court's judgment as to Pemco's contract claims should be reversed and

---

[11] Pemco's notice of appeal lists additional docket entries as district court orders on appeal. Pemco's brief, however, is singularly focused on the district court's dismissal of its misappropriation-of-trade-secrets claim.

remanded for a new trial. Specifically, Boeing argues that the district court erred in imposing the spoliation sanction and in reading the adverse-inference instruction to the jury. In addition, Boeing argues that the district court erred in reading the implied-promise instruction to the jury. Boeing contends that each error independently warrants a new trial.

## III.    STANDARD OF REVIEW

We apply multiple standards of review in this appeal. The district court dismissed Pemco's misappropriation-of-trade-secrets claim under Federal Rule of Civil Procedure 12(b)(6). We review that decision *de novo*. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11th Cir. 2010).

"We review a district court's imposition of a discovery sanction, such as . . . [an] adverse[-inference] jury instruction, for abuse of discretion." *Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1304 (11th Cir. 2020). Under this standard "we can only reverse discovery sanctions and grant a new trial if the court made a clear error of judgment or applied the wrong legal standard." *Id.* (internal quotation marks omitted).

For jury instructions generally, we have observed that the standard of review "is simultaneously *de novo* and deferential." *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014). "We review jury instructions *de novo* to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party but give the district court wide

discretion as to the style and wording employed." *Id.* (internal quotation marks omitted). "So long as the jury instructions accurately reflect the law," the trial judge has "wide discretion as to the style and wording employed." *Ermini v. Scott*, 937 F.3d 1329, 1335 n.2 (11th Cir. 2019) (internal quotation marks omitted). "We will reverse the trial court because of an erroneous instruction only if we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Bearint ex rel. Bearint v. Dorell Juv. Grp.*, 389 F.3d 1339, 1351 (11th Cir. 2004) (internal quotation marks omitted).

## IV.    DISCUSSION

There are three issues before us. First, we address the district court's pretrial dismissal of Pemco's misappropriation-of-trade-secrets claim. Second, we discuss Boeing's cross-appeal of the final judgment on the ground that the district court erred in imposing sanctions upon it for spoliation of ESI and in giving the adverse-inference jury instruction. Third, we address Boeing's cross-appeal of the district court's final judgment on the ground that the district court committed reversible error in giving the implied-promise jury instruction.

### A.    Pemco's Misappropriation-of-Trade-Secrets Claim

We begin with Pemco's misappropriation-of-trade-secrets claim. Pemco's challenge to the district court's dismissal order turns on which statute of limitations applies—the ATSA's or the MUTSA's. If we determine—as the district court did—that ATSA's

two-year statute of limitations applies, then Pemco's claim is time-barred. But if the MUTSA's five-year statute of limitations applies, the parties agree that Pemco's misappropriation-of-trade-secrets claim would not be time-barred because it was filed within the five-year limitations period.[12]

Our choice-of-law analysis proceeds in two parts. First, we address the choice-of-law provision in the NDA, on which the parties focus their arguments.[13] From our analysis of the NDA's choice-of-law provision, we conclude that the MUTSA's statute of limitations applies, meaning Pemco's claim is not time-barred. Second, we explain why the MUTSA's statute of limitations would apply even if we were to agree with Boeing that Pemco's misappropriation-of-trade-secrets claim falls outside the ambit of the NDA's choice-of-law provision.

---

[12] The parties provide no briefing on when Pemco's misappropriation-of-trade-secrets cause of action accrued. Before the district court, Boeing represented that only four years had elapsed since Pemco's claim became actionable.

[13] Boeing argues that the NDA's choice-of-law provision must be read in conjunction with a choice-of law provision in the MOA. That provision indicates that "[t]his MOA shall be governed by the laws of the state of Missouri, without resort to conflict of laws provisions." Doc. 568-18 at 8. Boeing did not raise this argument in its motion to dismiss and has forfeited the argument as a result. *See Reider v. Philip Morris USA, Inc.*, 793 F.3d 1254, 1258 (11th Cir. 2015). But, as we explain below, even if we were to find merit in Boeing's argument on this point, the result of this appeal would not change. *See* discussion *infra* Section IV.A.2.

### 1.    *The Choice-of-Law Provision*

The parties first direct our attention to the NDA's choice-of-law provision. Contractual choice-of-law provisions are generally enforceable under Alabama law, at least for breach-of-contract claims. *See Stovall v. Universal Constr. Co.*, 893 So. 2d 1090, 1102 (Ala. 2004) ("In a contractual dispute, Alabama law would have us first look to the contract to determine whether the parties have specified a particular sovereign's law to govern."). Pemco asserts that the NDA's choice-of-law provision governs not only claims for breach of the parties' contract, but also Pemco's tort claim for misappropriation of trade secrets.[14] Boeing asserts that the NDA's choice-of-law provision is limited to breach-of-contract claims. Underlying the parties' arguments is the assumption that Alabama courts would defer to a choice-of-law provision when the claim at issue is a statutory tort. We assume, without deciding, that under Alabama law choice-of-law provisions are enforceable to the extent they cover tort claims.[15]

---

[14] There is no dispute that misappropriation of trade secrets is a tort claim. Pemco refers to the claim as a "statutory tort" in its complaint, Doc. 34 at 95, and as a tort in its briefing. Boeing likewise refers to the claim as a tort in its briefing.

[15] Whether Alabama courts would enforce a choice-of-law provision in a contract when the claim at issue is a statutory tort is a question for which we do not find a clear answer. *See Williams v. Norwest Fin. Ala., Inc.*, 723 So. 2d 97, 101 (Ala. Civ. App. 1998) (observing that the choice-of-law provision at issue

In answering whether the NDA's choice-of-law provision encompasses tort claims, both parties rely on our decisions applying the law of various sovereigns, so we will do the same.[16] We have explained that "[i]n determining whether a choice of law clause contained in a contract between two parties also governs tort claims between those parties, a court must first examine the scope of the provision." *Cooper v. Meridian Yachts Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009). "A choice of law provision that relates only to the agreement will not encompass tort claims." *Id.* In *Cooper* we considered whether the following choice-of-law provision was broad enough to encompass tort claims: "This Agreement, and all disputes arising out of or in connection with it, shall be construed in accordance with and shall be governed by the Dutch law." *Id.* at 1158–59. As a matter of plain language, we observed that the choice-of-law provision "purport[ed] to govern 'all disputes' having a connection to the agreement and not just the agreement itself." *Id.* at 1162. Therefore, we concluded that a third-party's indemnity, contribution, and subrogation action (which arose from a theory of tort liability) was governed by Dutch law. *Id.* at 1162–63.

---

"d[id] not supersede the rule of 'lex loci delicti'"). Neither party raised this issue, however, so we need not address it.

[16] Pemco argues on appeal that the scope of the choice-of-law provision is a question governed by Missouri law. As Boeing correctly points out, however, Pemco did not make this argument before the district court. Thus, the argument is forfeited. *See Reider*, 793 F.3d at 1258.

Our decision in *Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292 (11th Cir. 2003), provides an example of a choice-of-law provision that is too narrow to encompass tort claims. In that case, the choice-of-law provision at issue indicated in relevant part: "[This agreement] shall be governed and construed in accordance with the laws of the State of Delaware." *Id.* at 1300. In contrast to the choice-of-law provision in *Cooper*, the provision at issue in *Green Leaf* did "not refer to related tort claims or to any and all claims or disputes arising out of [the agreement] or arising out of the relationship of the parties." *Id.* Thus, the choice-of-law provision did not extend to the plaintiffs' tort claims. *Id.* at 1301.

In this case we find the language in the NDA's choice-of-law provision sufficiently broad to encompass Pemco's misappropriation-of-trade-secrets claim. The provision indicates as follows:

> The interpretation of this Agreement and the rights and liabilities of the parties to this Agreement shall be governed by the law of the state of Missouri, excluding its conflicts of laws principles.

Doc. 568-19 at 14. The provision comprises two parts. It indicates that Missouri law governs *both* "the interpretation of this Agreement" *and* "the rights and liabilities of the parties to th[e] Agreement." *Id.* The first clause, having to do with the interpretation of the "Agreement," is the sort of language we have interpreted as focused purely on interpreting a contract's terms. *Green Leaf*, 341 F.3d at 1300 (observing that "the effect of this clause is narrow in

that only [the agreement] itself is to be construed in accordance" with the relevant state's law). But the second clause dictates that some things beyond the Agreement's terms—the "*rights and liabilities of the parties* to the Agreement"—are also governed by Missouri law. Doc. 568-19 at 14 (emphasis added). To conclude that the "rights and liabilities" clause carries no independent meaning would make that clause redundant. The parties agree we ought to avoid an interpretation that would render one of the clauses redundant. But the question remains—given that the "rights and liabilities" clause carries its own meaning, what is that meaning?

We conclude that the "rights and liabilities" clause carries a meaning broad enough to encompass Pemco's misappropriation-of-trade-secrets claim. The focal point of the "rights and liabilities" clause is not the "Agreement" but rather "*the parties* to th[e] Agreement." *Id.* As we put it in *Green Leaf*, the choice-of-law provision is of the type that governs "claims or disputes . . . arising out of the relationship of the parties." *Green Leaf*, 341 F.3d at 1300.

We do not mean to suggest by our ruling that the "rights and liabilities" clause is boundless, encompassing any and all torts that could ever arise between Pemco and Boeing. To the contrary, the choice-of-law provision, fairly read, is concerned with the rights and liabilities of the parties that have some nexus to "th[e] Agreement." Doc. 568-19 at 14. But, to decide this case, we have no need to define the outer bounds of what sort of tort claims would fall into the "rights and liabilities" clause. We think it clear that Pemco's misappropriation-of-trade-secrets claim, which arose

20-11141            Opinion of the Court            25

from the exchange of proprietary information in connection with the parties' teaming arrangement, is the sort of tort claim the parties intended Missouri law to govern. Thus, we find that Missouri law governs Pemco's misappropriation-of-trade-secrets claim, and as a result Pemco's misappropriation-of-trade-secrets claim is not time-barred.[17]

### 2.    *The* Lex Loci Delicti *Rule*

Even if we were to conclude, as Boeing urges, that Pemco's misappropriation-of-trade-secrets claim falls outside the scope of the NDA's choice-of-law provision, the outcome would be no different. We would simply perform the appropriate analysis under Alabama's choice-of-law regime. In the alternative, we conduct that analysis below and likewise conclude that the MUTSA's five-year statute of limitations applies to Pemco's claim.

"Alabama law follows the traditional conflict-of-law principles of *lex loci contractus* and *lex loci delicti.*" *Lifestar Response of*

---

[17] Neither party provides authority on whether Alabama courts would defer to the MUTSA's five-year statute of limitations where the application of Missouri law is predicated on the language of the choice-of-law provision, rather than the application of the *lex loci delicti* rule. In the *lex loci delicti* context, however, it is a separate question whether Alabama courts would apply another state's statute of limitations in addition to its substantive law. *See Precision Gear Co. v. Cont'l Motors, Inc.*, 135 So. 3d 953, 957 (Ala. 2013). Assuming that Alabama courts would discriminate between a state's substantive and procedural law in this context, the MUTSA's five-year statute of limitations would apply nonetheless, for the reasons we lay out below. *See* discussion *infra* Section IV.A.2.ii.

*Ala., Inc. v. Admiral Ins.*, 17 So. 3d 200, 213 (Ala. 2009). "Under the principles of *lex loci contractus*, a contract is governed by the law of the jurisdiction within which the contract is made." *Id.* (citing *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502 (Ala. 1991)). "Under the principle of *lex loci delicti*, an Alabama court will determine the substantive rights of an injured party [asserting a tort claim] according to the law of the state where the injury occurred." *Id.* (citing *Fitts v. Minn. Mining & Mfg. Co.*, 581 So. 2d 819 (Ala 1991)). In general, "a claimant who files a tort action in Alabama is subject to application of the lex loci delicti rule to his tort action." *Ne. Utils., Inc. v. Pittman Trucking Co.*, 595 So. 2d 1351, 1354 (1992). Because the parties agree that misappropriation of trade secrets is a tort, we apply the rule of *lex loci delicti*, as understood by the Supreme Court of Alabama.

i.        The Time and Place of Injury

The rule of *lex loci delicti* "will determine the substantive rights of an injured party according to the law of the state where the injury occurred." *Fitts*, 581 So. 2d at 820. Although the Supreme Court of Alabama has not answered when an injury occurs for the purposes of a misappropriation-of-trade-secrets claim, both parties point us to *Ex parte U.S. Bank National Association* for guidance. 148 So. 3d 1060 (Ala. 2014)

In *U.S. Bank*, the Supreme Court of Alabama explored the concept of injury as it applies to a malicious prosecution claim. That case involved Sterne Agee, a Delaware corporation with its headquarters in Alabama. *Id.* at 1062. Sterne Agee acted as "the

underwriter in Washington for securities offered by a Washington business entity." *Id.* U.S. Bank sued Sterne Agee in federal court, alleging that Sterne Agee had violated Washington's securities laws. *Id.* After two trials and two appeals, Sterne Agee won in the U.S. Court of Appeals for the Ninth Circuit. *Id.* Eventually, Sterne Agee turned the tables on U.S. Bank, suing it in Alabama state court for malicious prosecution. *Id.* The question before the Supreme Court of Alabama was whether Alabama or Washington law should apply to Sterne Agee's malicious prosecution claim. *Id.*

Relevant here are statements the Supreme Court of Alabama made about injury in the context of its *lex loci delicti* analysis. The court noted that an injury occurs "in the state where the last event necessary to make an actor liable for an alleged tort takes place." *Id.* at 1070. (citing Restatement (First) of Conflict of Laws § 377 (Am. L. Inst. 1934)). Put differently, "the place of injury is in the state where the 'fact which created the right to sue' occurs." *Id.* (quoting *Ala. Great S.R.R. v. Carroll*, 11 So. 803, 806 (1892)). The Supreme Court of Alabama concluded that the fact which created the right to sue in *U.S. Bank* was the "termination of the allegedly malicious lawsuit" in Washington. *Id.* at 1070–72. Thus, Washington law, not Alabama law, applied.

Applying *U.S. Bank*'s logic here, we ask when, under Alabama law, does an injury for a misappropriation-of-trade-secrets claim occur? As it turns out, we find an answer rather easily. In *AVCO Corporation v. Precision Air Parts, Inc.*, we wrote that "Alabama would rule that the actionable injury occurs, if at all, either

at the time of misappropriation or when disclosure of the trade secret is made." 676 F.2d at 498. Admittedly, we were answering a different question in that case—whether misappropriation of trade secrets was a continuing tort under Alabama law. *Id.* at 496. But we see no indication that the Supreme Court of Alabama would take issue with our statement in *AVCO Corporation.*

Further, our characterization of where and when under Alabama law a misappropriation injury occurs is not out of the ordinary; other states in our circuit follow the same rule. For example, applying Georgia law in *Manuel v. Convergys Corporation*, we said that "[i]n a trade secret misappropriation case, the *lex loci delicti* is . . . where the tortious act of misappropriation and use of the trade secret occurred." 430 F.3d 1132, 1140 (11th Cir. 2005). The same has been said of Florida law. *See Bates v. Cook, Inc.*, 615 F. Supp. 662, 676 (M.D. Fla. 1984) ("[U]nder Florida law, the *lex loci delicti* standard should be interpreted as the place of the wrong in cases involving misappropriation of trade secrets."). Courts in our circuit have found this proposition uncontroversial. *See E.A. Renfroe & Co., Inc. v. Rigsby*, No. 06-1752, 2008 WL 11376586, at *3 (N.D. Ala. Oct. 29, 2008) (applying Alabama law and noting that "[t]here is extensive case law holding that for the tort of misappropriation of trade secrets, the tort occurs where the misappropriation occurs" (collecting cases)). We are convinced that Alabama courts would hold that under Alabama law a misappropriation-of-trade-secrets injury occurs at the point of misappropriation.

This means that Pemco suffered its trade secrets injury in Missouri. Pemco alleged in its complaint that Boeing misappropriated its trade secrets at Boeing's divisional headquarters in St. Louis, Missouri, where Boeing used Pemco's proprietary information to prepare and submit its own bid. Boeing does not challenge that allegation on appeal, choosing instead to focus our attention on where Pemco felt the financial harm. Because the alleged injury occurred when Boeing misappropriated Pemco's trade secrets in St. Louis, Missouri law applies to Pemco's misappropriation-of-trade-secrets claim.

Boeing asks us to apply, as the district court did, the financial harm test. Under this test, courts determine the time and place of an injury within the *lex loci delicti* analysis by looking to where a party was financially harmed. A slew of federal district courts has applied this test. *See, e.g.*, *APR, LLC v. Am. Aircraft Sales, Inc.*, 985 F. Supp. 2d 1298, 1306 (M.D. Ala. 2013) ("[T]he place of injury for tort claims involving financial injury is the state in which the plaintiff suffered the economic impact." (alteration in original) (internal quotation marks omitted)); *Movie Gallery US, LLC*, 648 F. Supp. 2d at 1262 (applying the same test); *Glass v. S. Wrecker Sales*, 990 F. Supp. 1344, 1348 (M.D. Ala 1998) (same). Boeing argues that Pemco suffered financial harm in Alabama because its principal place of business, and its coffers, are in Alabama.

Boeing's argument is a non-starter. The *U.S. Bank* court observed that, while federal district courts had used a financial-harm test as a one-size-fits-all approach to determine the place of injury,

there was no basis for that approach under Alabama law. *U.S. Bank*, 148 So. 3d at 1071. Remarkably, *U.S. Bank* cited to the very decision we are discussing right now—the district court's dismissal of Pemco's misappropriation-of-trade-secrets claim—and noted that the district court did not rely on Alabama law when it applied the financial-harm test. *Id.*

At bottom, Boeing confuses the concept of injury—the misappropriation—with the concept of damages—the resulting financial harm. The Supreme Court of Alabama has long drawn a clear distinction between the two. "It is clear that the word 'injury' . . . used in its proper legal sense . . . [means] wrongful act or omission. 'Damage,' the result of the wrongful act, . . . is a correlative term of wholly distinct meaning and application." *Age-Herald Pub. Co. v. Huddleston*, 92 So. 193, 197 (Ala. 1921). In effect, *U.S. Bank* admonished federal district courts for not recognizing this distinction when the cause of action arises from an injury—like misappropriation—that is not necessarily financial in nature. Given our pronouncement in *AVCO Corporation* and the Supreme Court of Alabama's reasoning in *U.S. Bank*, we conclude that Missouri law governs Pemco's misappropriation-of-trade-secrets claim.

ii.    The Substantive Statute of Limitations

But just because we have found that Missouri law would govern Pemco's misappropriation-of-trade-secrets claim under *lex loci delicti* does not mean that we automatically apply the MUTSA's statute of limitations. Rather, "[u]nder *lex loci delicti*[, Alabama] will enforce only those laws of the other state that are

*substantive* in nature." *Etheredge v. Genie Indus.*, 632 So. 2d 1324, 1326 (Ala. 1994) (emphasis added). "Although *lex loci delicti* governs substantive law, *lex fori*—the law of the forum—governs procedural matters." *Middleton v. Caterpillar Indus.*, 979 So. 2d 53, 57 (Ala. 2007). We must decide, therefore, whether the MUTSA's statute of limitations is substantive or procedural under Alabama law. For the following reasons, we conclude that the MUTSA's statute of limitations is substantive, so it applies here.

Alabama courts will defer to another state's statute of limitations "only when it is demonstrated that the limitation is so inextricably bound up in the statute creating the right that it is deemed a portion of the substantive right itself." *Etheredge*, 632 So. 2d at 1327 (internal quotation marks omitted). Put another way, a statute of limitations is substantive under Alabama law when it is "built-in" to the statute conferring the substantive right. *Battles v. Pierson Chevrolet, Inc.*, 274 So. 2d 281, 285 (Ala. 1973).

Two cases from the Supreme Court of Alabama, *Etheredge* and *Precision Gear Co. v. Continental Motors, Inc.*, 135 So. 3d 953 (Ala. 2013), help us understand what "built-in" means. In *Etheredge*, the Supreme Court of Alabama considered a case in which a personal-injury plaintiff was injured by a product in North Carolina but sued in Alabama state court. *Etheredge*, 632 So. 2d at 1324–25. The question was whether North Carolina's statute of repose barred plaintiff's claim. *Id.* at 1324. The court concluded that it did not, for two reasons. First, North Carolina's statute of repose existed separately from the products liability cause of action. The

statute of repose appeared in a general "Civil Procedure" chapter of the North Carolina General Statutes. *Id.* at 1327. Second, the statute of repose was applicable to several causes of action, not just products liability actions. Those qualities, in the *Etheredge* court's view, showed that the statute of repose was in no way built-in to North Carolina's products-liability cause of action.

The *Continental Motors* court conducted a similar inquiry. There, the court considered whether Alabama's or Oklahoma's statute of limitations applied to indemnity claims brought under Oklahoma law. *Cont'l Motors, Inc.*, 135 So. 3d at 955. Material to the *Continental Motors* court's analysis was that the plaintiff had advanced two Oklahoma indemnity claims—one under an Oklahoma statute and one under Oklahoma common law. *Id.* at 957. Neither cause of action, the court observed, had an accompanying statute of limitations that was built-in to the cause of action itself. *Id.* Finding no substantive statute of limitations in Oklahoma, the court applied Alabama's statute of limitations. *Id.*

The MUTSA's five-year statute of limitations[18] has the qualities the Supreme Court of Alabama found wanting in *Etheredge*

---

[18] The MUTSA's statute of limitations provides:

> An action for misappropriation shall be brought within five years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For

and *Continental Motors*. The statute of limitations is codified in the middle of the MUTSA itself. *See* Mo. Rev. Stat. § 417.461 (appearing in middle of the MUTSA, which runs from Mo. Rev. Stat. § 417.450 to Mo. Rev. Stat. § 417.467). Moreover, the MUTSA's statute of limitations is tailor-made for MUTSA claims alone; it applies to no other causes of action. And when Missouri passed the MUTSA, it made clear that it was "displac[ing] conflicting tort, restitutionary, and other laws . . . for misappropriation of a trade secret." Mo. Rev. Stat. § 417.463. This statement shows that the MUTSA's statute of limitations has coexisted with the substantive cause of action since its inception. These qualities establish that the MUTSA's statute of limitations is "built-in" to the substantive cause of action, such that an Alabama court would defer to it.

In sum, the MUTSA and its five-year statute of limitations applies to Pemco's misappropriation-of-trade-secrets claim. The district court erred in concluding otherwise. The district court dismissed Pemco's misappropriation-of-trade-secrets claim solely on the basis that it was barred by the ATSA's statute of limitations. It did not consider whether Pemco sufficiently alleged the elements of a trade secrets claim under the MUTSA. Because the district court did not consider that question, and because the parties have

---

the purposes of this section, a continuing misappropriation constitutes a single claim.

Mo. Rev. Stat. § 417.461.

not briefed the issue on appeal, we remand Pemco's misappropria-tion-of-trade-secrets claim to the district court for the district court to decide whether the claim may proceed.

## B.     The Spoliation Sanction

We next consider whether the district court erred in sanc-tioning Boeing for the spoliation of ESI. "Spoliation is defined as the destruction of evidence or the significant and meaningful alter-ation of a document or instrument." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) (internal quotation marks omit-ted). Spoliation of evidence, in appropriate circumstances, "may warrant the imposition of sanctions." *Id.* We review the district court's decision to impose discovery sanctions for an abuse of dis-cretion. *Higgs*, 969 F.3d at 1304. "A district court abuses its discre-tion only when it misapplies the law or bases its decision on find-ings of fact that are clearly erroneous." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1313 (11th Cir. 2011). We find no abuse of discretion here.

Federal Rule of Civil Procedure 37(e) governs the proce-dures and sanctions available when a party spoliates ESI. Rule 37(e) "forecloses reliance on inherent authority or state law to determine

when certain measures should be used." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.[19] Rule 37(e) provides:

> **Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced though additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A) presume that the lost information was unfavorable to the party;
>>
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

---

[19] Although they do not bind us, we afford "the interpretations in the Advisory Committee Notes . . . great weight" in interpreting Rule 37(e). *Horenkamp v. Van Winkle & Co.*, 402 F.3d 1129, 1132 (11th Cir. 2005).

> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

Boeing challenges the spoliation sanction on three grounds. First, it contends that there was no duty to preserve ESI at the time the Pemco-related information was deleted from Blake's computer. Second, it asserts that there was insufficient evidence that Boeing acted with the intent to deprive Pemco of the ESI, which is required to authorize an adverse-inference jury instruction. Third, Boeing argues that the adverse-inference jury instruction the district court gave was disproportional to the conduct Boeing was found to have engaged in. We consider each of these arguments in turn and reject them for the reasons we explain below.

### 1.    *The Duty to Preserve ESI*

A party cannot be sanctioned for spoliation of ESI if there is no duty to preserve ESI in the first place. *See* Fed. R. Civ. P. 37(e) (referring to ESI "that should have been preserved in the anticipation or conduct of litigation"). The Advisory Committee's notes make clear that Rule 37(e) "does not attempt to create a new duty to preserve." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Rather, the rule operates in conjunction with the "common-law obligation to preserve." *Id.*

We have followed in unpublished opinions the principle that the duty to preserve arises when litigation is "pending or reasonably foreseeable" at the time of the alleged spoliation. *Oil Equip. Co.*

*v. Mod. Welding Co.*, 661 F. App'x 646, 652 (11th Cir. 2016); *see also Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) (same). Our sister circuits follow the same principle. *See, e.g.*, *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001) ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998))); *see also John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) ("[I]t is beyond question that a party to civil litigation has a duty to preserve relevant information, including ESI, when that party has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation." (alteration in original) (internal quotation marks omitted)). This seems to us the appropriate standard.

Here, the district court made a finding that litigation was reasonably foreseeable to Boeing at the time of the spoliation. Boeing fails to establish that the district court's finding was clearly erroneous—ample evidence supported the finding. Nearly a year before Blake deleted the ESI in August of 2006, Boeing assessed internally that it could "expect an ugly, lengthy legal battle" if it terminated its arrangement with Pemco. Doc. 263-31 at 3. Boeing asserts that this evidence of potential litigation was temporally too far removed from the spoliation—a year before the files were deleted on Blake's computer. Even accepting that premise, which we find dubious at best, there is ample evidence that litigation was reasonably

foreseeable closer to the time the files were deleted from Blake's computer. For example, after Boeing terminated the teaming arrangement, Pemco told Boeing, "[y]ou guys have violated the agreement . . . and we're likely going to do something about it." Doc. 263-7 at 47:12–23. At trial, Pat Finneran, the president of Boeing's division involved in the recompete contract, testified that Boeing anticipated that Pemco "would probably sue" after Boeing terminated the MOA. Doc. 588 at 53:9–21. We need not run through all the evidence the district court considered in its 30-page memorandum opinion; there was no clear error in the district court's finding that litigation was reasonably foreseeable at the time the ESI was deleted from Blake's computer. Thus, the district court did not err in determining that Boeing had a duty to preserve the ESI.

### 2.     *The Evidence of Boeing's Intent to Deprive*

Boeing next argues that the district court made another clearly erroneous finding of fact—that Boeing spoliated ESI with the "intent to deprive" Pemco of that evidence at trial. Boeing's theory is that there was insufficient evidence to support that finding. We disagree.

Rule 37(e) provides that an adverse-inference jury instruction is appropriate "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). The Advisory Committee's notes make clear that destruction of evidence due to "negligence or gross negligence" does not warrant an adverse-inference jury

instruction. *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. The rule is less clear, however, in providing affirmative guidance as to what sort of evidence would support a finding of an intent to deprive.

We have long required a showing of "bad faith" to support adverse-inference jury instructions based on the absence of evidence. *See Tesoriero*, 965 F.3d at 1184 (observing that "bad faith" is the standard for spoliation sanctions); *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (explaining that "an adverse inference" is warranted when the "absence of . . . evidence is predicated on bad faith"). Here, the parties agree that, in determining whether there was an intent to deprive, the appropriate question for us to ask is whether Boeing acted with bad faith. We therefore proceed by asking whether the district court clearly erred in finding that Boeing acted with bad faith when it destroyed the ESI.

The evidence in the record easily supports the district court's finding of bad faith in this case. "[B]ad faith in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence." *Tesoriero*, 965 F.3d at 1184 (internal quotation marks omitted). The district court considered how the deletion took place, which showed purposeful conduct. Blake summoned two employees, Holden and Smith, to his office. Both Holden and Smith had already successfully complied with the Firewall Plan by removing Pemco-related information from their own computers. Indeed, Holden was the Boeing employee charged with administering the Firewall Plan. When Holden, Smith, and Blake were

together, the emails were deleted in two discrete steps, suggesting purposeful action rather than an inadvertent mistake—Pemco-related information was moved into the recycle bin on Blake's computer, and then the recycle bin was emptied. And rather than notify Boeing's legal department of an inadvertent deletion, Holden and communicated to the department that Blake had nothing to send them.

The district court also considered the context of the deletion. It explained that Blake was the head of the Truman Project. The Truman Project was a secret group that evaluated the ways in which Boeing could exit the teaming arrangement and convert the Pemco-Boeing bid into a Boeing-only bid. Blake's seniority was such that he gave permission as to whether Boeing employees should be "read into" the Truman project. Doc. 603 at 134:3–5. Taken together with other evidence the district court considered in its thorough opinion, there was plenty of evidence to support the district court's conclusion that Boeing acted in bad faith, that is, that Boeing acted with the intent to deprive Pemco of the ESI for use in litigation. We see no clear error in the district court's findings that the predicate for imposing sanctions under Rule 37(e)(2) was met.

### 3.    *The Adverse-Inference Jury Instruction*

The last argument Boeing advances on the spoliation sanction is that the district court abused its discretion in the severity of the sanction it chose—an adverse-inference jury instruction. In support of its argument, Boeing cites the general principles in the

Advisory Committee's notes that "[t]he remedy should fit the wrong" and severe sanctions "should not be used when the information lost was relatively unimportant or lesser measures . . . would be sufficient to redress the loss." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Boeing argues that the evidence lost on Blake's computer was relatively unimportant and that it likely was produced elsewhere in discovery. But, of course, Boeing cannot substantiate its speculation because the evidence that could do so has been permanently deleted.

What's more, the adverse-inference jury instruction was not as severe a sanction as Boeing makes it out to be. In the district court, Pemco lobbied for a more severe jury instruction, arguing that because the district court had already found, in a pretrial order, that Boeing had acted with the intent to deprive Pemco of the ESI, there was no need for the court to instruct the jury to make a duplicative finding. The implication of Pemco's argument was that the district court could simply instruct the jury that it could make the adverse inference.

Boeing maintained that there were no grounds for sanctions in the first instance. But, in the event the district court chose to give an adverse-inference instruction, Boeing implored the district court to instruct the jury to make the finding the district court had already made—that Boeing acted with the intent to deprive Pemco of the ESI—before drawing any adverse inference. Only if the jury independently made that finding, Boeing argued, could it infer that

the ESI was unfavorable to Boeing. The district court instructed the jury along the lines of Boeing's request:

> If you find (1) that Boeing was anticipating litigation with Pemco (or reasonably should have been), and (2) that Boeing deleted this information with the intent to deprive Pemco of the use of the information in litigation relating to this dispute, you may infer that the lost information was unfavorable to Boeing. If you do not make these findings, you may not infer from the loss of the information that it was unfavorable to Boeing.

Doc. 565 at 8. We find no abuse of discretion in this instruction. The instruction correctly stated the law and did not mislead the jury. It required the jury to find the predicates for an adverse-inference instruction found in Rule 37(e)(2). And based on these predicates the court itself found before trial, the court could have imposed an even harsher sanction, allowing the jury to simply draw the adverse inference. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (observing that the intent-to-deprive finding "may be made *by the court* when ruling on a pretrial motion . . . or when deciding whether to give an adverse inference instruction at trial" (emphasis added)).

Boeing also contends that, if we uphold the district court's discovery sanction, we will be imposing cumbersome document retention policies on companies to account for everyday business decisions. This argument makes little sense. It ignores the record

evidence that Boeing itself thought it would be a good idea to institute a Firewall Plan for document retention purposes after it terminated the teaming arrangement. Boeing was expecting Pemco to sue. Boeing's problem was that it failed to follow its own Firewall Plan. Our decision in no way departs from our established law holding that, in such circumstances, parties may not destroy material evidence.

Given our deferential standard of review, and the substantial amount of evidence that supported the district court's sanction, we decline to disturb the jury's verdict on this ground.

## C.    The Jury Instruction on the Implied Promise of Good Faith and Fair Dealing

We move to the third and final issue before us. Boeing argues that the district court erred when it instructed the jury on a claim that the plaintiff did not plead—breach of the implied promise of good faith and fair dealing. Boeing's argument rests on the premise that Pemco had to plead the claim for the district court to instruct the jury on it. Pemco attacks this premise by asserting that, under Missouri law,[20] "[t]he implied duty of good faith is not a separate claim beyond or divorced from the contract." *Meridian Creative All.*, *LLC v. O'Reilly Auto. Stores, Inc.*, 519 S.W.3d 839, 845 (Mo. Ct. App. 2017). Pemco argues that encompassed within its

---

[20] Boeing does not dispute that Missouri law governs the breach-of-contract claims.

breach-of-contract claims was the proposition that Boeing breached the implied promise of good faith and fair dealing.

Even assuming (without deciding), that Boeing is correct—that Pemco had to plead a claim for breach of the implied promise of good faith and fair dealing—we decline to disturb the jury's verdict on this ground. As we noted above, we will only reverse a jury's verdict based on a challenged jury instruction when "we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Bearint*, 389 F.3d at 1351. We have no such doubt here.

The jury instruction at issue provided:

Pemco . . . has advanced two claims against Boeing. Both claims allege a breach of contract.

In addition to the express terms of a contract, the law implies a promise between the parties that they will not do anything to interfere with a party's right to receive the contract's benefits. However, any such implied promise does not obligate either party to take any action that is contrary to the express terms of the contract, and there can be no breach of such an implied promise where the defendant acts in accordance with the express terms of the contract.

I will now instruct you on the elements of Pemco's two breach of contract claims against Boeing.

Doc. 565 at 8. Boeing argues that the jury was misled into thinking it could find in Pemco's favor on the contract claims if it found that Boeing breached an implied promise aside from whether Boeing breached any express contract. But the second sentence of the instruction made clear that "there can be no breach of such an implied promise where the defendant acts in accordance with the express terms of the contract." *Id.* So nothing in the instruction suggested to the jury that it could find for Pemco without finding that Boeing breached an express contract. The district court did not ask the jury to make any findings regarding a breach of the implied promise claim; nor did the verdict form make any mention of such a claim. Boeing fails to contend with those realities. We find here no indication that the jury was misled by the instruction such that a new trial is warranted.

## V.    CONCLUSION

For the foregoing reasons, we **REVERSE** and **REMAND** the district court's order dismissing Pemco's misappropriation-of-trade-secrets claim. We **AFFIRM** the final judgment on the two breach-of-contract claims. Pemco's motion to strike Boeing's 28(j) letter or file a sur-reply in the alternative is denied as **MOOT**.